David DeBIASI, Plaintiff,

v.

CHARTER COUNTY OF WAYNE, a municipal corporation, Robert Ficano, individually and in his capacity as "Sheriff" of Wayne County, and Mark Ulicny, individually and in his capacity as "Personnel Director" for Wayne County, jointly and severally, Defendants.

No. 02–CV–71956–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 23, 2003.

Jamil Akhtar, Esq., Troy, MI, for plaintiff.

Cheryl A. Yapo. Esq., Detroit, MI, for defendants.

## OPINION AND ORDER AFFIRMING MAGISTRATE JUDGE'S MAY 21, 2003 ORDER GRANTING DEFENDANTS' MOTION TO DISQUALIFY JAMIL AKHTAR AS PLAINTIFF'S COUNSEL

ROSEN, District Judge.

### I. BACKGROUND

Plaintiff David DeBiasi is a white male lieutenant in the Wayne County Sheriff's Department who is suing Wayne County, the Wayne County Sheriff and the County's Personnel Director for reverse discrimination because he believes that Sheriff Robert Ficano promoted a fellow lieutenant, Lieutenant Pamela McClain, to the position of Commander in March 2002 because she is a black female and he needed to get the black vote in the City of Detroit in the August 2002 primary election for County Executive. As lieutenants in the Wayne County Sheriff's Department, Plaintiff is, and Ms. McClain was at all times relevant to this lawsuit, members of Wayne County Law Enforcement Supervisory Local 3317—AFSCME (the "Union"). Jamil Akhtar is Plaintiff's attorney in this lawsuit. Mr. Akhtar is also the Union's general counsel. He has represented Local 3317 for the past 14 years, has been a member of the Union's bargaining team and the panel member appointed by the Union to arbitrate its collective bargaining agreement. [See Plaintiff's Response Brief, p. 2.][1] Prior to her promotion to Commander, Ms. McClain was also a member of the Union's bargaining team. Id.[2]

As discovery in the instant lawsuit progressed, the Defendants perceived an apparent conflict of interest with Mr. Akhtar continuing to represent Plaintiff in this lawsuit because of his representation of the Union and confidential/privileged information that he apparently obtained in that capacity (and not through discovery in this action) which unfairly prejudices Defendants. Further, Mr. Akhtar has filed a "fact" affidavit in support of Plaintiff DeBiasi's position concerning the County's

---

[1]. Prior to becoming general counsel for the union, Mr. Akhtar was himself a deputy sheriff and was from the late 1960s until 1978 the president of the union which represented deputy sheriffs. In 1978, Akhtar became the administrative assistant to then Sheriff William Lucas. In 1983, Akhtar became the assistant county executive in charge of public services personnel and human resources in the labor relations department. He held this position until his retirement in May 1986 when he went into private practice. Shortly after going into private practice, Mr. Akhtar became general counsel for Local 3317.

[2]. The commander position is not a union position.

promotion practices which would render him a witness in this lawsuit and the Defendants maintain that Akhtar's testimony concerning the matters he raised in his affidavit is necessary in order for them to present a complete defense to Plaintiff's allegations of discrimination. Although Defendants sought discovery several times in this lawsuit on these issues, at every instance, Mr. Akhtar asserted, and/or directed the Union president to assert, the attorney/client privilege to block Defendants' discovery requests.

Because of the perceived conflict of interest (and the attendant discovery problems), Defendants filed a motion to disqualify Mr. Akhtar as Plaintiff's counsel in this action. Plaintiff filed a written response to Defendants' motion arguing that there was no conflict of interest because Ms. McClain, Plaintiff's "comparable" in this discrimination matter, was not his client; his only client (other than Plaintiff) was the Union. The matter was subsequently referred to Magistrate Judge Virginia Morgan for hearing and determination. Magistrate Judge Morgan held a hearing on this matter on February 5, 2003 and, at the conclusion of the hearing, indicated her inclination to grant Defendants' motion for Mr. Akhtar's disqualification. Mr. Akhtar, however, asked that the decision be delayed until an ethics opinion could be obtained from the State Bar Professional Standards Division. Magistrate Morgan agreed to withhold her decision until such an opinion could be obtained. The State Bar ultimately did issue an advisory letter. The State Bar's response to Mr. Akhtar's request for ethics guidance on the conflict of interest issue, in summary, was as follows:

> Even though the labor union [and not individual union member Pamela McClain] is and was your client, it is possible that you could have received some confidential communications from an agent of your client... during your representation as general counsel during labor negotiations.

> \* \* \* \* \* \*

> Therefore, the test is whether or not you obtained any privileged and confidential information from the agent of your client during a former representation that could be used against her in this matter. If the answer is "yes", the conflict of interest rules could prevent your current representation. If the answer is "no", the ethics rules would permit your current representation.

The ethics letter did not change Magistrate Judge Morgan's decision and on May 21, 2003, she issued her written opinion granting Defendants' Motion to Disqualify. On May 29, 2003, Plaintiff appealed the Magistrate Judge's ruling and now asks this Court to reverse that decision. Defendants filed a written response to Plaintiff's appeal. The Court held a hearing on Plaintiff's appeal on August 27, 2003. Having reviewed and considered the Magistrate Judge's opinion, the parties' briefs, and the oral arguments of counsel, the Court now issues the following Opinion and Order and, for the reasons stated below, AFFIRMS the Magistrate Judge's ruling.

## II. PERTINENT FACTS

A. PLAINTIFF'S COUNSEL'S USE OF CONFIDENTIAL COMMUNICATION WITH ANOTHER CLIENT TO MAKE OUT PLAINTIFF'S CLAIM OF DISCRIMINATION IN THIS LAWSUIT

The heart of this lawsuit is Plaintiff's contention that Pamela McClain, the lieutenant who received the promotion to Commander which Plaintiff wanted, should not have received the promotion. During the course of discovery, Plaintiff requested that Defendants produce "any internal affairs files, relating to any investigation by the Wayne County Sheriff's Department,

of allegations brought against Pamela McClain." Defendants responded to this request by producing a copy of one internal affairs file wherein Pamela McClain was accused of racial harassment and discrimination. Plaintiff's counsel, however, relying upon "independent knowledge that Pamela McClain was called into a meeting with then Undersheriff Donald Watts and was represented by Lt. Gerard Grysko, then Vice–President [and now President] of Local 3317, and was given an oral reprimand and a transfer" as the result of $30,000 missing bond money for which Ms. McClain was allegedly responsible, claimed that Defendants were hiding evidence and not producing everything he requested.

In an attempt to support his claim of dilatory discovery tactics and to make out his claim of discrimination against Defendants, Plaintiff then deposed Ms. McClain and asked her at her deposition whether she "ha[d] ever been disciplined in any manner, that would include oral reprimands, while lieutenant or sergeant, that would include oral reprimands, written reprimands, time off?" Ms. McClain, however, denied ever being reprimanded. [*See* McClain 10/3/02 Dep., Plaintiff's Response, Ex 1, p. 49] Plaintiff then demanded Defendants to produce the internal affairs file concerning the missing $30,000 bond money. Defendants responded with a motion for protective order. Magistrate Judge Morgan conducted an *in camera* review of the file and based upon that review, determined that the internal affairs file concerning this incident need not be produced. Specifically, she held as follows:

> I have reviewed all of the documents contained in Defendants' Exhibit A. Plaintiff has indicated that he believes that there is discipline reflected in those which make Lieutenant McClain less worthy of promotion than the Plaintiff. I have reviewed those. *I have found no evidence and no documents that reflect any form of discipline, any form of negative comments with respect to McClain's supervision, and no adverse action contemplated with respect to her running of the department. Therefore, I find that the documents are not relevant to the claim of the Plaintiff,* and that Defendants' motion for protective order to prevent their production should be granted.

[Defendants' Appeal Response, Ex. B.]

Apparently determined to establish some record evidence to support his claim that Pamela McClain was not qualified for the promotion to commander based upon her alleged reprimand for the disappearance of $30,000 bond money, Plaintiff produced Union president, Lt. Gerard Grysko, pursuant to notice (and not by way of subpoena) for his own direct examination. Lt. Grysko represented Ms. McClain at her meeting with the Undersheriff. Apparently anticipating that Lt. Grysko would testify that Ms. McClain was disciplined for the missing bond money, Plaintiff sought to obtain Grysko's testimony for the record in this case. Although Plaintiff asserts in this case that Lt. Grysko did testify in his deposition that Ms. McClain was reprimanded for the missing bond money in the meeting with Undersheriff Watts, an examination of Grysko's deposition testimony does not bear out Plaintiff's representation that McClain was reprimanded. All that Lt. Grysko stated on the record was that Undersheriff Watts believed that some unidentified employee had stolen the money but that he did not think the Department could prove it, and that Watts was upset about that "and something about [a] procedure that wasn't implemented." [3] [Grysko Dep., p. 8.]

---

**3.** Lt. Grysko's testimony on direct examina-    tion by Mr. Akhtar was as follows:

Notwithstanding Plaintiff's mischaracterization of Grysko's testimony, with regard to the matters presented in this appeal, the more important issue is Mr. Akhtar's blocking of Defendants' discovery, including their cross-examination of Lt. Grysko, by himself asserting, and by instructing Lt. Grysko to assert, the attorney-client privilege and not answer Defendants' questions.

> Q: Are you familiar with the fact that there was a loss or theft of bond money in the amount of approximately $30,000 in the latter part of 2000 or early part of 2001?
>
> A (by Lt. Grysko): Yes, there was some problems.
>
> Q: And who was the person in charge, who was the lieutenant that was in charge of bond receipts and securing that money during the period of time that the money came up missing?
>
> A: Lieutenant McClain was in charge of the desk and the bond operation.
>
> Q: Did there come a point in time in the spring of 2001 that you had to represent officer McClain before Undersheriff Watts as it relates to the loss of that bond money?
>
> A: I believe yes.
>
>     \*    \*    \*    \*    \*    \*
>
> Q: And what did the undersheriff say as it relates to McClain handling of the bond money?
>
>     \*    \*    \*    \*    \*    \*
>
> A: The best I can recall is he, he had said that something about being pissed, that the bond—he made reference to this, to this incident where some money was, I say "embezzled", and I don't know what everyone else says it was, by, by an employee. And I think that Watts wanted the employee fired at one time when the employee was a probationary status, and that's who they believed did it, but I don't believe they can prove it. And I think he was upset about that and something about procedure that wasn't implemented.
>
> Q: What's your understanding of this procedure that wasn't implemented?
>
> A: It had something to do with where the money was kept, in a safe or in a drawer instead of a safe.

Apparently aware that by using, in the pursuit of the instant action, confidential information provided to him by another client presented some ethical problems, Mr. Akhtar has repeatedly represented in this case that he obtained information concerning Ms. McClain's alleged reprimand by Undersheriff Watts for the missing $30,000 "from someone other than Lt. Grysko." [4] However, during Pamela

> Q: Who had the responsibility of implementing this procedure?
>
> A: It was my understanding that McClain was in charge of that.
>
> Q: At that meeting, was McClain notified that she was being transferred out of her executive lieutenant position?
>
> A: It was a lateral transfer to another executive lieutenant spot. My understanding it was something political.
>
> Q: What makes you say it was political?
>
> A: Because the chief of operations, Eric Smith, had a problem with the executive lieutenant in charge of civil process, Gary Burtka, something to do he raided a chop shop or something to that effect. And either the chief wasn't notified or he didn't want it done at that time, it was something to do with the timing of the raid, and he wanted him out of that unit. So Watts saw this as an opportunity to flip flop these two. That's my understanding what I got from the meeting.
>
>     \*    \*    \*    \*    \*    \*
>
> Q: So as I understand your testimony, the purpose of the meeting was dealt [sic] directly with the loss of, or the embezzlement of $30,000 in bond money, and the fact that McClain did not implement procedures that she was instructed to implement; is that correct?
>
> A: The fact that she was going to be transferred also.
>
> Mr. Akhtar: Ok. I have nothing further.
> [Grysko 10/25/02 Dep., Defendants' Ex. A, pp. 7–13.]

4. At oral argument, Mr. Akhtar stated that he obtained this information from Stan Shipp who was, at the time of Ms. McClain's meeting with the Undersheriff, the president of the Union. (As indicated, Lt. Grysko was, at that time, the vice-president.)

McClain's deposition, in colloquy with Ms. Yapo concerning McClain's meeting with the Undersheriff and her union representative, Lt. Grysko, Mr. Akhtar stated as follows:

Ms. Yapo: Are you telling me right here on the record that the, that an agent of the union or the vice president or president of the union has talked to you about a meeting held with one of its members?

Mr. Akhtar: *I'm telling you that there was an attorney/client communication between Mr. Grisko [sic] and myself, and I choose not to discuss it with you.*

\* \* \* \* \* \*

Ms. Yapo: [N]ow what you're telling me... what you're telling me now is that you have had attorney/client communications with the, with the union president or vice-president, and now you're bringing those communications in to here?

Mr. Akhtar: No. I didn't say that at all. You can interpret anything you want to.

\* \* \* \* \* \*

Ms. Yapo: *So, how did Grysko, how did you get Grysko's knowledge?*

Mr. Akhtar: *Grysko confides everything to me when it happens.*

[McClain Dep., Defendants' Ex. D].

More problematic is Mr. Akhtar's conduct at Lt. Grysko's deposition with respect to instructing his client not to answer defense counsel's questions because of the attorney/client privilege.

After Mr. Akhtar completed his direct examination of Lt. Grysko, defense counsel Cheryl Yapo, cross-examined him. She commenced her cross-examination of Lt. Grysko by first asking him what his duties were in representing an individual member in a disciplinary action. Lt. Grysko explained his role pursuant to the guidelines in the Union contract that he could represent a union member at any stage of discipline, whether that might be at an internal affairs investigation or simply when the member is being questioned by a superior command officer. [Grysko Dep., pp. 13–14.] Ms. Yapo then asked Lt. Grysko whether he had talked to anyone about this lawsuit, including Mr. Akhtar, at which point Mr. Akhtar objected and instructed his client not to answer the question.

Q (by Ms. Yapo): Did you talk to Jim Akhtar about this lawsuit?

Mr. Akhtar: *Objection. Jim Akhtar is the attorney for the union. Mr. Grysko is the president and you're asking him to waive an attorney/client communication or privilege.*

*Mr. Grysko, I'm advising you as your attorney not to answer the question.*

Ms. Yapo: So now let me make sure that I get this right. You're acting as his attorney now because you're the attorney for the local.

Mr. Akhtar: Law firm is, my law firm is.

Ms. Yapo: So you're asking, you're telling him not to answer the questions about—

Mr. Akhtar: I'm not telling him anything... but I'm advising him he should give serious consideration on not waiving the privilege.

Q (by Ms. Yapo): Did you talk to Jim Akhtar about this lawsuit, Mr. Grysko?

A: I, is somebody going to rule on these objections one day? I mean I don't mind answering the question if someone rules on the objection.

Mr. Akhtar: *Just say that I choose not to waive the attorney/client privilege,*

*let her go into court and try to let her force you to do it . . . .*

&ast; &ast; &ast; &ast; &ast; &ast;

A: I'm not going to answer that particular question . . . .

Q: Okay then fine. Who else did you tell about the conversation . . . between Undersheriff Watts and Pam McClain, the one that you just testified to?

A: The Executive Board.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Did you tell anyone else about this conversation?

A: You know, you're talking about a year, a year or so ago, you know. Probably the answer is yes, I would say yes.

Q: Who else?

A: A lot of people asked me about it. They wanted to know why McClain was transferred and why the job wasn't posted, and why Burtka was transferred.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Does Jim Akhtar attend some of the Executive Board meetings?

A: Yes, he does.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: [A]t the time of the meeting between Pam McClain and Undersheriff Watts, Pam McClain was a lieutenant, is that right?

A: That's correct.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: And then you attended that meeting as Pam McClain's representative; is that right?

A: Once I got to the meeting, yeah, I would say I was her representative.

[Grysko Dep., pp. 16–20.]

Ms. Yapo then sought to question Mr. Grysko about a lunch meeting he attended with Mr. Akhtar, Plaintiff David DeBiasi, and Stan Ship, Mr. Grysko's predecessor as president of Local 3317. Again Mr. Akhtar instructed Mr. Grysko not to answer Ms. Yapo's questions:

Q: Can you tell me why you had lunch with Jim Akhtar, David DeBiasi, Stan Shipp and yourself some time in March 2002?

&ast; &ast; &ast; &ast; &ast; &ast;

A: Dave wanted to know what his options were when, with the union and with regard to this, this incident. He felt that he was discriminated against, and that's what the meeting was about.

Q: What did Jim Akhtar say?

Mr. Akhtar: Objection. The same privilege applies. any conversation you had between you and Mr. DeBiasi is not privileged, anything [sic] conversation between you and I is privileged, and I'm advising you not to answer.

Q (by Ms. Yapo): Well, there were four people at that meeting; is that right?

A: Yes.

Q: Was your attorney there, Jim Akhtar there as your representative, as your lawyer?

&ast; &ast; &ast; &ast; &ast; &ast;

A: Yeah, I was, it was a legal thing. That was my opinion, it was a legal thing. It was a legal matter.

*Id.* pp. 20–21.

B. *AKHTAR'S FILING OF A FACT AFFIDAVIT IN THIS ACTION*

In addition to acting as counsel for Plaintiff, Mr. Akhtar has filed a fact affidavit in support of his client's position in this action. In that affidavit, Mr. Akhtar stated as follows:

Jamil Akhtar after being first duly sworn, deposes and states that he is otherwise competent to give this affida-

vit and if called upon by this Honorable Court, would testify as follows:

1. I have been General Counsel for AFSCME Local 3317 since 1989 and Local 3317 represents the sergeants and lieutenants of the Wayne County Sheriff's Department and Airport Police Department.

2. I have been involved in the negotiations of all of Local 3317's contracts since 1989.

3. I am constantly called upon, on an almost daily basis, by the executive officers of Local 3317 to advise them as to contract interpretation and other related matters.

4. Prior to being admitted to the Michigan Bar in 1986, I had worked for Wayne County for twenty-three years. Twenty of those twenty-three years were spent as an employee of the Wayne County Sheriff's Department, and the last three years were spent working for former County Executive, William Lucas, as his Assistant County Executive, which included the responsibility of negotiating and arbitrating collective bargaining agreements.

5. To the best of my knowledge and recollection, the only lieutenant of the Wayne County Sheriff's Department promoted to commander in 1993 was a white female named Rose Fedora.

6. Based upon my best recollection, Executive Lieutenant Carl Zahn had his position reclassified to the position of commander in 1996, based upon an increase in duties.

7. To the best of my recollect, Lt. Larry Meyer was promoted to commander while he was a member of the Warrant Enforcement Unit of the Department of Community Justice, and not while he was a member of the Wayne County Sheriff's De-

partment. It is further my recollection that a political quid pro quo agreement was reached between the County Executive's Office and the office of Defendant, Sheriff Robert Ficano, which would provide for lt. Larry Meyer to be promoted to commander and remain in the Department of Community Justice, and that Defendant Ficano would be allowed to have certain positions unfrozen for the purpose of making political appointments.

Further Affiant sayeth not.

*See* Defendants' Ex. C.

As indicated, Mr. Akhtar's affidavit testimony relates to his knowledge of the contractual provisions at issue in this case and bears upon the parties' understanding of the final language of the relevant contract provisions. Additionally, according to his affidavit, Mr. Akhtar has knowledge going back 20 years concerning the process involved in the promotion of several individuals to the position of Commander in the Sheriff's Department. Defendants claim that Akhtar's testimony in this regard is vital to their ability to rebut the claim that the County discriminates against white males. Therefore, in addition to the conflict of interest issues raised by Mr. Akhtar's dual representation of the Union and Plaintiff and the insistence of Akhtar and his union client upon the attorney/client privilege, Defendants claim that because Mr. Akhtar has postured himself as a witness for Plaintiff whose testimony Defendants contend is necessary in order for them to present a complete defense in this action, Mr. Akhtar should be disqualified.

### III. *MAGISTRATE JUDGE MORGAN'S RULING*

In her written Opinion Granting Defendants' Motion to Disqualify Plaintiff's Counsel, Magistrate Judge Morgan held as follows:

It appears from the deposition and statements contained in the pleadings, that Mr. Akhtar obtained confidential information regarding [Pamela McClain]'s promotion and the circumstances surrounding it from such witnesses. Apparently, shortly before her promotion, McClain was embroiled in an investigation regarding the loss of $30,000 of bond money under her control. Mr. Akhtar... acquired information [concerning this meeting] from... union officers which was confidential in nature. This information bears directly on issues central to this case, the qualifications of McClain and the reasons for her promotion over the plaintiff. Mr. Akhtar stated at McClain's deposition that the union president, Grysko, "confides everything to me when it happens." (Dep. Trans. pp. 50–52, Ex. D to Defendants' Motion).

Disqualification of a lawyer in a case is a serious matter, and one which is not undertaken lightly, Confidential communications are at the heart of attorney representation and the public's confidence in lawyers. A client must be certain that the confidential information he places into the hands of a lawyer will be protected, unless the client waives that protection. Whether an attorney actually enters an appearance in a case or was paid money by the client matters less than the actual relationship and the appearance of impropriety that the public would have from disclosure of such communications. Here, plaintiff's counsel was paid to be general counsel to the union and in the course of such attorney representation, provided services to individual members related to confidential employment matters.... [Ms. McClain's] qualifications and the circumstances of her promotion are matters central to the defense of this case. Plaintiff's [counsel's] knowledge of matters confided to him in the course of his service to her as her union representative bears directly on those issues. Therefore, disqualification is mandated.

Plaintiff's counsel states that he never represented McClain "as an attorney" but he did apparently serve as her union representative... in his capacity as general counsel. As noted by Mr. Byerley of the State Bar: "the test is whether or not you obtained any privileged or confidential information from the agent of your client during a former representation that could be used against her in this matter. If the answer is 'yes', the conflict of interest rules could prevent your current representation." In this case, it appears that Mr. Akhtar has acquired such information and should not continue as counsel.

May 21, 2003 Opinion, p. 2.

## IV. DISCUSSION

### A. STANDARD OF REVIEW

Defendants' Motion to Disqualify Plaintiff's Counsel is a non-dispositive motion and as such, the Magistrate Judge's ruling on it is subject to reversal by this Court only "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).[5] See also, Fed.R.Civ.P.

---

5. 28 U.S.C. § 636(b)(1)(A) provides as follows:

(b)(1) Notwithstanding any provision of law to the contrary—
(A) a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, fr summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the

72(a) ("The district judge to whom the case is assigned shall consider [a party's] objections [to a magistrate judge's] order [on a nondispositive matter] and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.")

### B. *THE MAGISTRATE JUDGE'S RULING IS NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW*

■ Appellant Akhtar relies heavily on Pamela McClain's admission at her deposition that Mr. Akhtar has never represented her on a personal basis and argues that this establishes that there was no attorney-client relationship with Ms. McClain such that he should be disqualified from representing Mr. DeBiasi in this lawsuit who takes a position that is directly adverse to that of Ms. McClain. However, as the State Bar's Professional Standards Division explained, that no actual or direct attorney-client relationship existed between McClain and Akhtar is not controlling with regard to the conflict of interest rules; rather, the test is whether Mr. Akhtar received any confidential information from Ms. McClain by way of her agent (i.e., her union representative), during the course of Mr. Akhtar's representation as general counsel for the Union. Lt. Grysko testified that he represented Ms. McClain on behalf of the Union at the meeting with the Undersheriff concerning the missing $30,000 and her failure to implement procedures to secure the money. Mr. Akhtar does not dispute that Lt. Grysko, as president of Local 3317, was and is his "client". As Mr. Akhtar admits, Lt. Grysko "confides everything to me when it happens." [McClain Dep. pp. 50–52.] He further has stated in his sworn affidavit that he is "constantly called upon, on an almost daily basis, by the executive officers of Local

3317 to advise them" on various contract matters. Akhtar Affidavit, ¶ 3.

As the State Bar Professional Standards Division noted in its advisory opinion, Rule 1.9(b)(2) of the Michigan Rules of Professional Conduct is the applicable rule in this case. The rule states as follows:

(b) Unless the former client consents after consultation, a lawyer shall not knowingly represent a person in the same or a substantially related matter . . .

\* \* \* \* \* \*

(2) about whom the lawyer has acquired information protected by Rule 1.6 and 1.9(c) that is material to the matter.

MRPC 1.9(b)(2).

Rule 1.6, referenced in Rule 1.9(b)(2) above, makes it clear that the conflict of interest rules apply not only to attorney-client privileged information but also to any "other information gained in the professional relationship . . . the disclosure of which would be likely to be detrimental to the client." MRPC 1.6 specifically provides, in pertinent part:

(a) "Confidence" refers to information protected by the client-lawyer privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client.

(b) Except when permitted under paragraph (c), a lawyer shall not knowingly:

(1) reveal a confidence or secret of a client;

(2) use a confidence or secret of a client to the disadvantage of the client; or

court may reconsider any pretrial matter under this subparagraph (A) where it has

been shown that the magistrate judge's order is clearly erroneous or contrary to law.

(3) use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

MRPC 1.6(a), (b). *See also,* Rule 1.6, Comment ("The confidentiality rule applies to confidences and secrets as defined in the rule. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law.")

Subsection (c) of the Rule permits revealing confidences or secrets under limited circumstances. The pertinent exception here is subsection (c)(1) which allows a lawyer to reveal confidences or secrets only "with the consent of the clients affected, but only after full disclosure to them." MRPC 1.6(c)(1). In this case, no consent was ever sought from Ms. McClain.

Mr. Akhtar argues that Ms. McClain was not his client, nor was she an agent of his client such that he would have had to seek her consent to disclose or use for Mr. DeBiasi's advantage information he obtained through her union representatives concerning her.[6] However, the State Bar obviously takes a different view and deems Ms. McClain, as a member of the Union, to be an agent of the union for purposes of client confidentiality. *See* State Bar Advisory Opinion letter at Plaintiff's Appeal Ex. 3. Indeed, as a member of the Union, it can hardly be disputed that Ms. McClain would expect that information exchanged during a meeting with her superior with Union representation present would be considered confidential by her Union when the Union discussed the matter with its attorney. Moreover, to allow Mr. Akhtar to use information that he acquired as the Union's attorney to the advantage of one member against another member would have a chilling effect on Union members and destroy their confidence in Union representation. Further, as Magistrate Judge Morgan noted, disclosure of information gained by Mr. Akhtar from Gerard Grysko (or other Union officials with whom Grysko admitted sharing the information), when such Union representatives were standing in the shoes of the Union member Akhtar represented, (i.e., Lt. McClain), when they shared the information with Akhtar would create in the public at-large an appearance of impropriety.

A motion to disqualify counsel is the proper method for a party to bring an alleged breach of ethical duties to the court's attention. *Kitchen v. Aristech Chemical,* 769 F.Supp. 254, 256 (S.D.Ohio 1991)(citing *Musicus v. Westinghouse Elec. Corp.,* 621 F.2d 742 (5th Cir.1980)). The power to disqualify an attorney from a case is incidental to all courts, and a district court is obliged to consider unethical conduct by an attorney in connection with any proceeding before it. *Ex Parte Burr,* 22 U.S. (9 Wheat) 529, 531, 6 L.Ed. 152 (1824) (Marshall, C.J.). However, a trial court does not possess unfettered discretion to disqualify counsel. *Kitchen, supra,* 769 F.Supp. at 258. The extreme sanction of disqualification should only be utilized when there is a "reasonable possibility that some specifically identifiable impropriety" actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice. *SST Castings, Inc. v. Amana Appliances, Inc.,* 250 F.Supp.2d

---

**6.** Akhtar further argues that he should not be disqualified on the basis of conflict of interest because Ms. McClain is not a party to this litigation. However, the Court notes that Mr. Akhtar, on behalf of Plaintiff DeBiasi, has filed a Motion for Preliminary Injunction asking that the Court order the County to remove Ms. McClain from the Commander position to which she was promoted and promote Plaintiff to that position, in her place. Thus, Mr. Akhtar has, in effect, made Ms. McClain an interested party in this action.

863, 865 (S.D.Ohio 2002); *Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir.1976). As the Sixth Circuit observed in *Manning v. Waring, Cox, James Sklar and Allen*, 849 F.2d 222 (6th Cir.1988), at the core of the balancing of interests a court should undertake when considering a motion for disqualification are "the traditional concerns of the legal profession that client confidences be protected and that appearances of professional impropriety be avoided." *Id.* at 225.

■ As Magistrate Judge Morgan acknowledged, "[d]isqualification of a lawyer in a case is a serious matter, and one which is not undertaken lightly." MJ Opinion, p. 3. However, in this case, as the Magistrate Judge found, Plaintiff's counsel's knowledge of matters confided to him in the course of his service as general counsel for the Union—particularly with regard to the qualifications of Pamela McClain, who is the purported similarly-situated individual upon whom Plaintiff bases his claim for reverse discrimination—are central to the defense of this

case.[7] Furthermore, in reaching her conclusion that Defendants' Motion to Disqualify Mr. Akhtar should be granted, Magistrate Judge Morgan applied the test specified by the State Bar's Professional Standards Division in its advisory opinion letter and the standards established by courts in this Circuit.[8] Therefore, the Magistrate Judge's ruling was not clearly erroneous or contrary to law.

C. *MR. AKHTAR'S SUBMISSION OF A FACT AFFIDAVIT TO SUPPORT PLAINTIFF'S CLAIMS ENTITLES DEFENDANTS TO CROSS-EXAMINE HIM ON THE FACTS HE PRESENTED*

■ Although Magistrate Judge Morgan did not address the issue of Mr. Akhtar's submission of a fact affidavit, the Court finds that by submitting an affidavit of facts to support Plaintiff's claims against Defendants, Mr. Akhtar has placed himself in the position of being a witness for his client. As a fact witness, Defendants have the right to cross-examine Mr.

---

**7.** Plaintiff argues that the Magistrate Judge's finding should be deemed "clearly erroneous" because she mistakenly states in reciting the factual background of this case that Mr. Akhtar was present with McClain at meetings related to the investigation regarding the loss of $30,000 bond money, and that he "apparently, during this meeting or otherwise, acquired information from her and from union officers which was confidential in nature." Although the Court agrees that there is nothing in the record to establish Mr. Akhtar's presence at the meeting with the Undersheriff, Union president Grysko testified that Mr. Akhtar attended meetings of the Union's Executive Board and that he shared the information as to what transpired at that meeting with the members of Executive Board. Furthermore, Mr. Akhtar himself admits that "Grysko confides everything to me." As noted above, Magistrate Judge Morgan's recitation of the factual background was that Mr. Akhtar "during the meeting *or otherwise*" acquired confidential information. Therefore, to the extent that Plaintiff objects to the Mag-

istrate Judge's ruling on this basis the Court finds any misstatement as to Plaintiff's counsel's presence at the meeting with Ms. McClain and the Undersheriff insufficient to deem the ruling "clearly erroneous."

**8.** Although Plaintiff argues for application of the three-part test enunciated by the Sixth Circuit in *Dana v. Blue Cross & Blue Shield of Ohio*, 900 F.2d 882 (6th Cir.1990), as the court in *SST Castings, supra*, explained, that test is inapplicable where, as here, the court is faced not with an attorney's representation of a former and current client but rather with *concurrent* representation of two clients. As the *SST Castings* court noted, when an attorney concurrently represents two clients with adverse positions, impropriety is presumed, but the attorney may rebut that presumption by establishing "that he can represent adverse clients concurrently with equal vigor, without conflict of loyalties *and without using confidential information to the detriment of either client.*" *Id.* at 887 (emphasis added).

Akhtar as to the facts he presents in the affidavit.

According to his affidavit, Mr. Akhtar has knowledge of the contractual provisions at issue in this case because as the Union's attorney, he drafted and negotiated the provisions of the contract relating to the promotional process to Commander. Accordingly, he becomes a fact witness as to the intent of the parties and the understanding of the final language of the relevant contract provisions. Akhtar's testimony as to the interpretation of the contract could support Defendants' argument that they acted in compliance with the contractual provisions when the decision was made to promote Lt. McClain.

Additionally, according to his affidavit, Mr. Akhtar has knowledge going back more than 20 years of the process by which several individuals were promoted to Commander in the Sheriff's Department. Such testimony bears upon Defendants' argument that Wayne County does not discriminate against white males.

In sum, Akhtar's testimony could be important to the Defendants and their presentation of a complete defense to Plaintiff's allegations.

Rule 3.7(a) of the Michigan Rules of Professional Conduct provides:

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.

None of the exceptions to Rule 3.7(a)'s prohibition apply in this case. Mr. Akhtar's testimony concerning the facts presented in his affidavit does not relate to an uncontested issue nor does it relate to the nature and value of the legal services rendered by him. Therefore, the exceptions in subsections (1) and (2) are inapplicable. With respect to the "substantial hardship on the client" exception in subsection (3), there has been no showing of such substantial hardship on Plaintiff DeBiasi. As the Court noted at the hearing on this matter, there are many competent, experienced trial lawyers in the Detroit area who are well-versed in discrimination law and the kinds of issues presented in this case. Therefore, to require Plaintiff to obtain substitute counsel will not operate as an undue hardship on him.

### CONCLUSION

For all of the foregoing reasons, the Court finds that Magistrate Judge Morgan's May 21, 2003 order disqualifying Jamil Akhtar as Plaintiff's counsel is not clearly erroneous or contrary to law. Therefore,

IT IS HEREBY ORDERED that the Magistrate Judge's Order of May 21, 2003 is AFFIRMED. Accordingly,

IT IS FURTHER ORDERED that Jamil Akhtar is hereby DISQUALIFIED as Plaintiff's counsel in this case.

IT IS FURTHER ORDERED that Plaintiff shall have until October 31, 2003 to retain new counsel and for new counsel to file a notice of appearance in this matter.

IT IS FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction and Defendants' Motion for Summary Judgment are hereby dismissed without prejudice to the parties' right to re-file their motions after new counsel is retained by Plaintiff.